Filed 2/1/16  Mazgani v. S.B.S. Trust Deed Network CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MAHVASH MAZGANI, Individually and as Trustee, etc.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>S.B.S. TRUST DEED NETWORK, INC., et al.,<br><br>Defendants and Respondents. | B252174<br><br>(Los Angeles County<br>Super. Ct. No. BC474307) |

APPEAL from judgments of the Superior Court of Los Angeles County, William F. Fahey, Teresa Sanchez-Gordon, Judges.  Affirmed.

Michael Shemtoub and Howard Kapp for Plaintiffs and Appellants.

Law Offices of Ramin Azadegan, Ramin Azadegan and John L. Wollman for Defendants and Respondents Tower Capital, MLG Law Group, Alex Moussazadeh, Oliver Moussazadeh, Chino Hills Escrow, and Mandy Stover.

Kirby & McGuinn, Martin T. McGuinn and Elaine L. Chan for Defendant and Respondent S.B.S. Trust Deed Network.

## INTRODUCTION

Mahvash Mazgani, individually and as trustee as the Mazgani Family Trust (Mazgani), brought the present action against four groups of defendants: (1) Tower Capital, MLG Law Group, Oliver Moussazadeh, and Alex Moussazadeh (the Moussazadeh defendants); (2) Mandy Stover and Chino Hills Escrow, also known as Diamond Quality Escrow (sometimes referred to as Diamond); (3) S.B.S. Trust Deed Network, Inc. (SBS); and (4) Suburban Mortgage Company of New Mexico, d/b/a Intercap Lending (Intercap). Intercap is not a party to this appeal.

The trial court sustained demurrers without leave to amend as to some causes of action; it subsequently granted defendants' motions for summary adjudication of all of the causes of action that remained. This appeal followed.

Although Mazgani has pursued this matter as a single action and single appeal, her claims and appellate contentions against the various groups of defendants are almost entirely independent of one another. Accordingly, in the body of this opinion we separately address the appellate issues relevant to each group of defendants. As we now discuss, we affirm the judgments in their entirety.[1]

## APPEAL AS TO MOUSSAZADEH DEFENDANTS

## I.

## Relevant Facts and Procedural History

*A.     Allegations of the Complaint as to the Moussazadeh Defendants*

Mazgani filed the present action in November 2011, and filed the operative third amended complaint (complaint) in December 2012. As relevant to the Moussazadeh defendants, the complaint alleges that on April 24, 2010, Mazgani agreed to purchase property located at 141 South Clark Avenue, Unit 320, Los Angeles, from seller Debra

---

[1]     On appeal, Mazgani filed motions for various kinds of relief, including for summary reversal and for sanctions, on July 6 and 7, 2015. We deferred ruling on Mazgani's motions pending a determination on the merits; we now deny these motions in their entirety. We deny as moot SBS's motion to strike the declaration of Michael Shemtoub, filed July 16, 2015.

Ricci, who is not a party to this action. Because the sale was a "short sale" (a sale in which the purchase price was less than the outstanding mortgage balance), it required the approval of Ricci's lender, Bank of America. On June 25, 2010, Bank of America approved the short sale for a purchase price of $352,000.

The complaint alleges that the sale closed on August 18, 2010. Subsequently, Mazgani received a settlement statement that reflected "astronomical charges of unauthorized payments of (e.g.) $4,900 to MLG Law Group and . . . $10,560 payment to Tower Capital." Mazgani alleged that she "does not know who" Tower Capital (Tower) or MLG Law Group (MLG) are and that the payments to those entities "[were] conducted in a fraudulent manner and [were] an unauthorized taxation of Plaintiff[']s money." These payments, in which Oliver and Alex Moussazadeh are alleged to have participated, are alleged to give rise to three causes of action against the Moussazadeh defendants: breach of fiduciary duty/constructive fraud (third and sixth causes of action),[2] and violation of Business and Professions Code section 17200 (seventh cause of action).

### B. Demurrer

The Moussazadeh defendants demurred to the third, sixth, and seventh causes of action. They asserted that Oliver Moussazadeh was Ricci's real estate agent, Alex Moussazadeh was Ricci's attorney, MLG was Alex Moussazadeh's law firm, and Tower was Ricci's short sale negotiator. Thus, as agents for the *seller*, they did not owe duties of care to Mazgani, the *buyer*. Further, they asserted that the documents attached to the complaint demonstrated that Ricci, not Mazgani, paid the fees of MLG, Alex Moussazadeh, and Tower. Accordingly, the payment of fees could not have caused Mazgani any damages.

Mazgani opposed the demurrer. She asserted that the Moussazadeh defendants owed her fiduciary duties because they "claim[ed] to be negotiating a 'short sale' for the benefit of the Plaintiff." She further contended that she suffered damages as a result of

---

[2] The caption to the third cause of action does not name any of the Moussazadeh defendants, but MLG, Alex Moussazadeh, and Tower are identified as wrongdoers in the body of the cause of action.

3

the payments made to MLG and Tower:  "Plaintiff was put under the false belief that it was Bank of America who was demanding the $352,000.00 from her.  As pled, the Plaintiff did not know, much less authorize payment to Tower Capital for $10,500 or MLG Law Group for an additional $4,500 (and for that matter another $7,470 paid to Moussazadeh [out]side of the books)."

On March 22, 2013, the trial court sustained without leave to amend the demurrer as to the sixth and seventh causes of action, and overruled it as to the third cause of action.

### C.     Motion for Summary Adjudication of Third Cause of Action

In June 2013, the Moussazadeh defendants moved for summary adjudication of the third cause of action.  They urged that the third cause of action, which was the only remaining claim against them, (1) did not expressly name them, (2) alleged the same wrongdoing (fraud) as did the sixth cause of action, as to which a demurrer had been sustained, and (3) did not state a claim on which relief could be granted because defendants did not owe a duty to Mazgani as a matter of law.

Following a hearing, the trial court granted defendants' motion.  The court explained its order as follows:

"Mr. Taheri [Mazgani's counsel], you've been admonished by the court on several occasions, most recently on May 31 of this year, that this court strictly enforces all rules and deadlines and procedures.  And that's not to be harsh but rather because that levels the playing field and doesn't give one side an advantage over the other.

"In this case, you have multiple procedural defects which in and of themselves are [sufficient] and will be a basis for the court granting these motions.  I'll give you alternative rulings as well.

". . . You filed [your opposition and supporting declarations] at least nine days late.  Some of [the opposing declarations] apparently were served as late as 11 days after the due date.  [¶]  Now in this case . . . it's been very contentious and the parties negotiated a very clear briefing schedule which you endorsed.  It was endorsed by you in court.  You got a copy of it that day, and I frankly just don't believe your claim that

4

somehow you misplaced it and that you were looking for a new copy three days after your oppositions were due to be filed.

"The *Hobson* case cited by one of the parties . . . makes clear that late filed oppositions can and should be disregarded. Further, good cause declarations by counsel to get relief and file documents must be filed before the late filed documents.

"In this case, Mr. Taheri, you just unilaterally picked a new due date and filed these papers late [by] well over a week, sometimes more than ten days. . . . [¶] Further, the papers in opposition were in violation of Code of Civil Procedure 437c(b)(2) and California Rule of Court 3.31350(e). The so-called omnibus opposition was very, very confusing, only had minimal references to the evidence in this case. . . . [¶] . . . [¶] . . . The court declines to act as a surrogate for the plaintiff to search through a fairly rambling and unintelligible omnibus brief to see what evidence there may be in opposition to the summary judgment motion. It's further not proper in your opposition points and authorities to simply attach new unauthenticated exhibits. They are disregarded.

"Finally, the opposition, which is very long, is in violation of Rule of Court 3.1113(f). It has no table of contents which [is] important so the court can actually see the sequence of arguments and locate, if it's able to, your substantive opposition. No table of authorities as well.

"On those bases, the court is tentatively and strongly inclined to grant these motions. Separately and alternatively, the oppositions are substantively defective. Stated another way, the motions are well taken. [¶]

"As to the [Moussazadeh defendants], it appears that these defendants should not even be in this case. The third amended complaint and the third cause of action does not name these defendants. [¶] The confusion apparently arose in January of this year when there was a demurrer to the third, sixth, and seventh causes of action. That resulted in the court erroneously dealing with the third cause of action in the context of the demurrers when these defendants weren't in them. So the court's order of March 22, 2013 is

5

vacated . . . as these defendants were not named and were not required to have answered. And as a result, they are out of the case.

"The so-called omnibus opposition does not even address the third cause of action whether or not these defendants are in the case. So that motion is substantively well taken."

Judgment for the Moussazadeh defendants was entered September 25, 2013. Mazgani timely appealed.

## II.

### The Trial Court Properly Sustained the Demurrer to
### the Sixth and Seventh Causes of Action

*A.      Standard of Review*

A demurrer tests the legal sufficiency of a complaint by claiming it fails to state a cause of action based on defects appearing on its face or from matters subject to judicial notice. (*Alamo Recycling, LLC v. Anheuser Busch InBev Worldwide, Inc*. (2015) 239 Cal.App.4th 983, 994-995.) "In other words, a general demurrer ' "searches the complaint for all defects going to the existence of a cause of action and places at issue the legal merits of the action on assumed facts." ' (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 528.) On appeal, we are not bound by the trial court's determination but independently review the complaint to determine whether it states a cause of action under any legal theory. (*Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035, 1038-1039.) [¶] Our review of the legal sufficiency of the complaint is guided by well settled rules: we assume the truth of all properly pleaded material facts and consider judicially noticed matters, but we disregard asserted conclusions of fact and law. (*Blank v. Kirwan* [(1985)] 39 Cal.3d [311,] 318.)" (*Ibid.*)

*B.      The Demurrer Was Properly Sustained to the Sixth Cause of Action*
         *for Fraud*

The sixth cause of action alleges fraud. " ' " 'The elements of fraud . . . are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance;

6

(d) justifiable reliance; and (e) resulting damage.' " [Citation.]' (*Small v. Fritz Companies, Inc*. (2003) 30 Cal.4th 167, 173.)" (*Los Angeles Memorial Coliseum Com. v. Insomniac, Inc*. (2015) 233 Cal.App.4th 803, 831.)

       1.     <u>Mazgani Did Not Allege An Actionable Failure to Disclose Facts</u>

Mazgani alleges that the Moussazadeh defendants are liable for fraudulent nondisclosure because they failed to disclose payments to MLG and Tower. "To maintain a cause of action for fraud through nondisclosure or concealment of facts, there must be allegations demonstrating that the defendant was under *a legal duty* to disclose those facts. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp*. (2007) 157 Cal.App.4th 835, 845.)" (*Los Angeles Memorial Coliseum Com. v. Insomniac, Inc*., *supra*, 233 Cal.App.4th at p. 831, italics added.) Ordinarily, such a duty arises "only from fiduciary or fiduciary-like relationships." (*Id*. at p. 832.)

Mazgani asserts that Civil Code section 2079.16[3] created a duty on the part of each of the Moussazadeh defendants to disclose the fees paid from escrow to MLG and Tower. Section 2079.16, however, discusses only duties owed *by real estate agents*, and thus has no application to MLG, Tower, or Alex Moussazadeh, none of whom is alleged to be a real estate agent. Oliver Moussazadeh *is* alleged to be a real estate agent, but he represented the seller, not Mazgani. As the seller's agent, section 2079.16 imposed on him a limited affirmative obligation to disclose to Mazgani, the buyer, "facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties." The amounts of the payments made to the seller's agents are not facts "affecting the value or desirability *of the property*," and thus Oliver Moussazadeh did not have a duty under section 2079.16 to disclose them to Mazgani.

Mazgani also asserts that the Moussazadeh defendants had a duty to disclose the fees paid to MLG and Tower under the following principle set out in Miller & Starr,

---

**3**     The third amended complaint refers erroneously to *Code of Civil Procedure* section 2079.16, but no such section exists. We assume that the intended reference is to *Civil Code* section 2079.16.

California Real Estate 4th, section 368: "The agent owes a fiduciary duty to disclose to the principal any compensation or benefit that the agent will receive from the transaction. Under general agency law this obligation has been limited to the agent's principal. When the person receiving the secret profits is a real estate licensee, however, the duty is owed to other persons as well. There is a requirement that a real estate licensee must disclose to both parties any compensation received or anticipated from a lender in connection with the financing for the transaction prior to the close of the sales escrow. Further, the duty of fair and honest dealing that is owed by a real estate licensee to all parties to the transaction has been extended to preclude the receipt of any secret profits unknown to the party to the transaction who is not the agent's principal." (Footnotes omitted.)

On its face, the principle discussed by Miller & Starr applies only to "real estate licensee[s]," and thus, again, does not apply to MLG, Tower, or Alex Moussazadeh. As to Oliver Moussazadeh, this principle required him to disclose to Mazgani any "secret profits" or compensation he received or anticipated *from a lender.*" The third amended complaint does not allege that Oliver Moussazadeh (or anyone else) received compensation from the lender; and, while it alleges that MLG and Tower received "secret profits," it does not allege that Oliver Moussazadeh did so.[4] Accordingly, the sixth cause of action fails to state a claim for fraudulent nondisclousure.

2. Mazgani Failed to State a Claim for Damages Arising Out of the Alleged Fraudulent Nondisclosure

As we have said, an essential element of a claim for fraudulent nondisclosure is that the defendants' alleged misconduct caused the plaintiff harm. (*Los Angeles Memorial Coliseum Com. v. Insomniac, Inc.*, *supra*, 233 Cal.App.4th at p. 831; see also *Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088,

---

[4]     Mazgani asserts in her appellant's opening brief that the Moussazadeh defendants "fail[] to mention" that Oliver Moussazadeh "secreted a 'bonus commission' from [Mazgani]'s nephew (who negotiated the sale) in the amount of $8,800 (ultimately paid by Plaintiff/Appellant)." This alleged bonus commission is not alleged in the complaint, and therefore it is not relevant to our review of the order sustaining the demurrer.

1102.) In the present case, Mazgani claims that she was harmed because she paid the Moussazadeh defendants' allegedly unauthorized fees. However, the settlement statement that Mazgani attached to the complaint, and on which she relies to establish the at-issue payments, shows that MLG and Tower were paid by the seller, *not* by Mazgani. That is, the settlement statement shows that Mazgani paid into escrow the contract price of $352,000, plus settlement charges of $2,747 and property taxes of $170. The payments to MLG and Tower were "settlement charges *to seller*," which were treated as "reductions in amount due *to seller*." The fees about which Mazgani complains, therefore, reduced the amount received by the seller, but did not increase the amount Mazgani paid. Having alleged that she paid at closing precisely the contract sale price on which she and Bank of America had agreed, Mazgani has failed to allege that she suffered any harm as a result of the payments to MLG and Tower.

For all of these reasons, therefore, the trial court properly sustained the demurrer to the sixth cause of action.

C.      *The Demurrer Was Properly Sustained to the Seventh Cause of Action for Violation of Business and Professions Code Section 17200*

The seventh cause of action alleges a violation of the Unfair Competition Law (UCL), Business and Professions Code section 17200 (section 17200). Section 17200 prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice."

Our conclusion that the Moussazadeh defendants did not have not have an affirmative obligation to disclose to Mazgani the payments to MLG and Tower is dispositive of the UCL claim because "a failure to disclose a fact *that one has no affirmative duty to disclose*" is not actionable under section 17200. (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 838, italics added; see also *Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1556-1557 [defendants' failure to disclose breakdown of fees was not a fraudulent business practice under section 17200 because defendant owed no duty to disclose those fees]; *Searle v. Wyndham Internat., Inc.* (2002) 102 Cal.App.4th 1327, 1334 [hotel's practice of

9

imposing 17 percent service charge without disclosing to guests that service charge was paid to the servers was not a fraudulent business practice because hotel guests had no right to know what hotel was paying servers].)

Our conclusion that Mazgani did not allege damages is also dispositive of the seventh cause of action because to bring a UCL claim, a private individual must have " 'suffered injury in fact and . . . lost money or property as a result of the unfair competition.' " (Bus. & Prof. Code, § 17204; *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227.)  Because Mazgani did not suffer any injury, she lacked standing to pursue a UCL claim.  The demurrer to the seventh cause of action was properly sustained.

## III.

### The Trial Court Properly Granted Summary Adjudication
### Of the Third Cause of Action

*A.*      *Standard of Review*

We generally review a summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  (*Whitehead v. Habig* (2008) 163 Cal.App.4th 896, 901.)  " ' "In so doing, we apply the same three-step analysis required of the trial court:  We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond.  Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor.  Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue." ' ([*Truck Ins. Exchange v. Amoco Corp*. (1995) 35 Cal.App.4th 814, 822].)"  (*Puskar v. City and County of San Francisco* (2015) 239 Cal.App.4th 1248, 1251.)

Alternatively, where the trial court grants summary judgment because the opposing party failed to comply with procedural requirements, we review the summary judgment for an abuse of discretion.  (*Whitehead v. Habig*, *supra*, 163 Cal.App.4th at p. 901 [failure to file separate statement].)  " 'In applying the abuse of discretion standard

10

of review, it is not the role of the appellate court to substitute its own view as to the proper decision.' [Citation.]" (*Ibid.*)

B. *The Trial Court Properly Granted the Moussazadeh Defendants' Motion for Summary Adjudication of the Third Cause of Action*

1. The Third Cause of Action Does Not State a Valid Claim for Relief[5]

We note as an initial matter that the Moussazadeh defendants correctly assert that the caption to the third cause of action—"Third Cause of Action for Breach of Duty/Constructive Fraud (Against Chino Hills Escrow (AKA Diamond Quality Escrow), a Calif Corp and Mandy Stover)"—does not mention them. While we are mindful that the caption of a complaint is not dispositive and " 'in determining who the parties to an action are the whole body of the complaint is to be taken into account, and not the caption merely' " (*Plumlee v. Poag* (1984) 150 Cal.App.3d 541, 547, quoting *Nelson v. East Side Grocery Co.* (1915) 26 Cal.App. 344, 347), we do not believe the third cause of action unambiguously put the Moussazadeh defendants on notice that the third cause of action was alleged against them.

In any event, even if the third cause of action is construed to name the Moussazadeh defendants, it does not properly state a cause of action against them. The three paragraphs that refer to the Moussazadeh defendants allege as follows:

"57. Additionally, in the effort to defraud the Plaintiff, MLG Law Group (an entity whose form is unknown) and Alex Moussazadeh (an individual) joined forces with the Escrow defendants and engaged in fraud. [¶] . . . [¶]

"59. Both MLG Law Group (an entity whose form is unknown) and Alex Moussazadeh (an individual) owed duties of integrity and fidelity and other statutory duties of disclosure to Plaintiff. Specifically, but without limitation, [Civil Code] Section

---

[5] Mazgani asserts on appeal that, having overruled the Moussazadeh defendants' demurrer to the third cause of action, the trial court lacked authority to reconsider whether that cause of action stated a claim for relief. We reject this contention, as our Supreme Court has held that a trial court has inherent authority to "act on its own motion to correct its own errors." (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1104.)

11

2079.16 requires that all material facts, including the fact that there was a payment of $4,900 to MLG Law Group (and its principal, Mr. Moussazadeh) and [a] $10,560 payment to Tower Capital was going to be paid using the Plaintiffs['] money; or any money at all to the aforesaid, before these sums were paid [*sic*].

"60.    Additionally, the payments [of] $4,900 to MLG Law Group and $10,560 payment to Tower Capital and others was conducted in a fraudulent manner and an unauthorized taxation of the Plaintiffs['] money [*sic*].  The Escrow Defendants, MLG Law Group (and its principal, Mr. Moussazadeh) and Tower Capital have done everything they could do, including falsely charging the Plaintiff for costs that were never authorized or incurred."

As we have said, Civil Code section 2079.16 does not create any duties alleged to have been breached by the Moussazadeh defendants and, in any event, Mazgani does not allege that she suffered any damages as a result of the alleged breach.  Accordingly, the third cause of action does not state a claim on which relief can be granted against the Moussazadeh defendants.

2.    The Moussazadeh Defendants Made a Prima Facie Case Negating Mazgani's Claim, and Mazgani Did Not Successfully Rebut It

Assuming arguendo that the third cause of action stated a valid claim for relief, summary adjudication nonetheless was properly granted.  In support of summary adjudication, the Moussazadeh defendants identified the following undisputed material facts:

Undisputed Fact No. 3:  Oliver Moussazadeh "was the listing broker representing Debra Ricci (the 'Seller'), the owner of the Clark Property and did not at any time represent Plaintiff/buyer, as a broker, agent, or otherwise, in connection with the sale of the Clark Property."

Undisputed Fact No. 9:  "Alex Moussazadeh ('Alex') is a California licensed attorney and the principal of MLG and Tower.  As principal of Tower and on behalf of Seller, he conducted extensive negotiations with [Bank of America] in connection with the sale of the Clark Property."

12

Undisputed Fact No. 10:  "MLG was hired by Seller to review documents in connection with the sale of the Clark Property, including without limitation reviewing the chain of title, performing some transactional work and negotiating and/or resolving any potential liens and/or encumbrances on the Clark Property."

Undisputed Fact No. 11:  "At no time prior to the commencement of the within action did Alex:  (i) ever speak [with] or meet Plaintiff; or (ii) represent Plaintiff as an attorney, agent or otherwise in connection with the Clark property or any other matter."

Mazgani's opposition to the motion for summary judgment and separate statement of disputed material facts were untimely and did not comply with the applicable rules of court.  The trial court therefore was well within its discretion in disregarding them. (E.g., *Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 259 [trial court was within its discretion in disregarding late-filed declaration in opposition to summary judgment].)[6]

---

[6]     Mazgani argues at some length in her appellant's opening brief that the trial court abused its discretion by disregarding her opposition to the summary adjudication motion on procedural grounds.  Because we conclude on the merits that Mazgani's opposition failed to raise a triable issue of material fact as to the Moussazadeh defendants, we do not individually address Mazgani's contentions regarding her opposition's procedural infirmities.

We also reject Mazgani's contention that the summary judgment motion was untimely because it was filed and served less than 75 days before the motion hearing. While Code of Civil Procedure section 437c, subdivision (a) provides for service of a motion for summary judgment at least 75 days before the hearing, the statutory notice period may be shorted by stipulation.  (*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1014-1015.)  That is precisely what occurred here:  On May 22, 2013, all counsel, *including counsel for Mazgani*, stipulated to a briefing schedule that permitted defendants' motions for summary judgment to be heard on less than 75 days notice.  Having stipulated to shortened notice, Mazgani may not rely on such shortened notice as a basis for reversal.

At oral argument, Mazgani's counsel conceded that his predecessor had stipulated to shortened notice, but he urged that the stipulation was not valid because it was entered into by counsel, not by Mazgani herself.  The sole case counsel cited for this proposition, *Robinson v. Woods* (2008) 168 Cal.App.4th 1258, does not support it.  While *Robinson* holds that the notice period may not be shortened by the court without the consent of both

13

But in any event, the opposition did not properly raise any disputed factual issues that precluded summary judgment. While Mazgani characterized defendants' undisputed facts 3, 9, 10, and 11 as "disputed," she did not offer any evidence to contradict them.[7] And, while her separate statement asserted that she retained MLG and Oliver Moussazadeh to represent her, she cited to absolutely no evidence that such was the case. As a result, Mazgani failed to satisfy her burden of raising a triable issue of material fact as to her claims against the Moussazadeh defendants, and the motion for summary adjudication was properly granted. (See *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 ["[T]he Hodjats fail to provide any facts, much less citations to evidence in the record, to support [their] sweeping accusations of wrongdoing. As a result, they have failed to satisfy their burden of raising a triable issue of material fact as to their claims or as to State Farm's defenses."]; *Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197 ["An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and conclusory assertions' [citation], or mere possibilities [citation]."].)

<hr />

parties, it nowhere suggests that such consent may not be given through counsel. (*Id*. at p. 1264, quoting *Urshan v. Musicians' Credit Union* (2004) 120 Cal.App.4th 758.)

[7]    Mazgani's purported disputed material "facts" were as follows: "All of the correspondences and emails were between Oliver Moussazadeh, [Bank of America], Ms. Mazgani, Mr. Moda [Mazgani's nephew], Mandy Stover, [and] Diamond Quality Escrow, and there is not a scantianalia [*sic*] of proof presented that MLG did anything but an illegal act when it made Oliver Moussazadeh, a non[]attorney[,] a part of the MLG Law Group." "Alex did not need to 'speak,' 'meet with,' sign a retainer with Mazgani in order to be 'representing' her, when Mazgani consulted, negotiated with, and later paid MLG Law Group [*sic*] for the work that it allegedly [did] in this matter on her behalf (including getting a party to subscribe to a short sale on a hasty basis). Legal authorities generally define a 'client' as 'a person or entity which consults with a lawyer for the purpose of retention or advice even if neither results.' [Citations.] For purposes of the attorney/client privilege and established a relationship [*sic*], all [that is ] necessary is that the attorney-client relationship exists between a law corporation and its client, as well as between the individual lawyers employed by the law corporation and the corporation's clients . . . as Mr. Oliver Moussazadeh of MLG Law Group was to Mazgani."

14

## APPEAL AS TO DIAMOND QUALITY ESCROW

## I.

### Relevant Facts and Procedural History

A. *Allegations of Complaint as to Diamond Quality Escrow*

The complaint alleges that on June 30, 2010, Mazgani and Ricci opened an escrow account with Diamond Quality Escrow through escrow agent Mandy Stover. Subsequently, Mazgani arranged to fund $109,000 of the sale price through a loan from Intercap. Mazgani executed a note in favor of Intercap on August 12, and the loan was funded on August 13. However, on August 14, 2010, Intercap requested that Diamond return the $109,000 to it because the loan had been improvidently funded. Thereafter, "[d]isregarding their obligations under the Escrow Instructions, the Escrow Defendants unlawfully . . . permitted [Intercap] to unwind the loan and then transferred the money that Intercap had deposited into Escrow back to it." In further violation of the escrow instructions, Diamond released unauthorized payments of $4,900 to MLG and $10,560 to Tower.

The complaint asserts that the return of the loan proceeds to Intercap and the payment of MLG's and Tower's fees gave rise to three causes of action against Diamond: (1) breach of contract (second cause of action); (2) breach of duty/constructive fraud (third cause of action); and (3) violation of Business and Professions Code section 17200 (seventh cause of action).

B. *Diamond's Motion for Summary Judgment*

Diamond moved for summary judgment. It noted that Mazgani's three causes of action against it all were premised in significant part on the same alleged fact: that Diamond returned $109,000 to Intercap without Mazgani's permission and in violation of the escrow instructions. Diamond asserted, however, that it had never received any funds from, or returned any funds to, Intercap in connection with Mazgani's purchase of the property. In support, Diamond submitted the declaration of Mandy Stover, the escrow agent who handled the escrow in connection with the sale of the property. Stover declared as follows:

15

"4.    On or about June 30, 2010, Plaintiff and the seller signed escrow instructions opening escrow on [the property].  This transaction was to be an 'all cash' transaction.  On or about August 14, 2010, Plaintiff, through her real estate agent, asked Escrow to draw an amendment to the June 30, 2010 escrow instructions evidencing a loan from Suburban Mortgage Company of New Mexico dba Intercap Lending in the amount of $109,000.00.

"5.    Intercap Lending did not deposit Plaintiff's loan with Diamond Quality Escrow, Inc.  Diamond Quality Escrow, Inc. did not hold any funds for Intercap Lending in Plaintiff's real estate transaction involving the purchase of the property located at 141 S. Clark Dr. #320, Los Angeles, CA 90048.

"6.    On or about Saturday August 14, 2010, I received an email from Bea Peters at Intercap Lending demanding their loan money back on Plaintiff's real estate transaction involving the purchase of [the property].

"7.    On or about August 16, 2010, I contacted Chicago Title and I informed them of Intercap Lending's demand for return of Plaintiff's loan money.  It was my understanding that Chicago Title Company was the holder of Intercap Lending's funds.

"8.    Neither I, nor Diamond Quality Escrow, Inc., had any say in the decision by Chicago Title Company as to whether Intercap Lending's loan amount would be sent back to Intercap Lending. . . ."

Stover further declared that Diamond did not make payments to MLG or Tower from Mazgani's funds:

"12.    The final Settlement Statement in Plaintiff's transaction involving the purchase of [the property] evidences that the entities MLG Law Group and Tower Capital are in the Seller's Column of the final Settlement Statement, and are not payable by Plaintiff, Buyer.

"13.    Diamond Quality Escrow, Inc. did not issue any payment to MLG Law Group and/or Tower Capital from Plaintiff's funds."

16

## C.    *Mazgani's Opposition to Diamond's Motion for Summary Judgment*

In opposition to Diamond's motion for summary judgment, Mazgani did not dispute that Chicago Title (not Diamond) returned the funds to Intercap.  She urged, however, that Diamond was responsible for the return of funds to Intercap because "Chicago Title was acting as the [a]gent of [Diamond]."  Mazgani's only support for her claim that Chicago Title was Diamond's agent was the following sentence of the escrow instructions, which were attached as an exhibit to Mazgani's separate statement:  "Funds, instructions, or instruments received in this escrow may be delivered to, or deposited with any title company to comply with terms of this escrow."**[8]**

Mazgani also purported to dispute Diamond's assertion that the payments to MLG and Tower were made from buyer's funds, not from Mazgani's, with the following assertion in her separate statement:  "With the exception of the fact that the Excel sheet created by the Movants ad hoc was made up and they could have put any figure that they wanted anywhere in the [E]xcel sheet and they do wish this Hon. Court to recognize that all of the monies for the purchase of the house, and all commissions, all the amounts that were secreted and all the amounts which were undisclosed—but paid out to other cohorts were result of fraud[] on part of the Movants [*sic*]."  Mazgani's declaration in support of her opposition stated that she was not aware that MLG and Tower would be paid from escrow and "would have never agreed to" such payments, but she did not dispute that such payments were made from the seller's funds, not from Mazgani's.

---

**[8]**    The single statement in Mazgani's declaration relevant to the return of funds to Intercap is as follows:  "Thereafter, [Diamond] breached the escrow instructions and sent the $109,000.00 of Intercap [*sic*] back to it.  Though [Diamond] states that Chicago Title was the entity that was holding the money and that they are the ones who returned it[,][Diamond] cannot with a straight face say that Chicago was not its agent for closing title and funding and Chicago listened to [Diamond's] instructions."

17

*D.      Court's Order Granting Summary Judgment*

After noting that Mazgani's opposition's myriad procedural defects were an adequate basis for granting Diamond's motion for summary judgment, the trial court found in the alternative that Diamond's motion was well taken on the merits.  The court explained:  "An escrow company has very limited duties.  It must simply comply with the instructions given by the parties.  Here, it seems that the facts show that [Diamond] did not get [$109,000] from Intercap.  [Diamond] had no say [in] the funds going back to Intercap.  The motion for summary judgment is well taken."

## II.

### The Trial Court Properly Granted Summary
### Judgment for Diamond Quality Escrow

As we have said, all three causes of action against Diamond were based in significant part on same factual allegation:  that Diamond returned $109,000 to Intercap in violation of the escrow instructions.  In support of its motion for summary judgment, Diamond submitted evidence that it never received any funds from, or returned any funds to, Intercap in connection with Mazgani's purchase of the property.  Mazgani did not meaningfully dispute this evidence.  The sentence in the escrow instructions on which she purports to rely to demonstrate that Chicago Title acted as Diamond's agent—that "Funds, instructions, or instruments received in this escrow may be delivered to, or deposited with any title company to comply with terms of this escrow"—manifestly does not evidence an agency relationship between Chicago Title and Diamond.  Accordingly, the trial court properly found no triable issue of material fact as to Diamond's role in returning funds to Intercap.

The trial court also properly found no triable issue of material fact as to fees paid to Tower and MLG.  In support of its motion for summary judgment, Diamond submitted evidence that the payments to Tower and MLG were made by the *seller*, not by Mazgani.  Mazgani's statement in opposition that she "would have never agreed to" such payments does not raise a triable issue of fact as to the source of the payments.  Summary judgment was properly granted.

18

## APPEAL AS TO S.B.S. TRUST DEED NETWORK, INC.

## I.

## Relevant Facts and Procedural History

### A. *Complaint and Cross-Complaint*

Mazgani contracted with SBS to initiate nonjudicial foreclosures on real property located at 1117 South Westlake Avenue and 239 West 25th Street, Los Angeles, California. In September 2011, SBS invoiced Mazgani for fees and costs of $1,344.76 and $1,409.64. Mazgani did not pay these invoices, and SBS obtained a small claims default judgment against her.

Mazgani filed a motion to vacate the default judgment, which the court granted; the same day, Mazgani named SBS as a defendant in the present action.[9] As to SBS, the complaint alleged that Mazgani had a contract with SBS, Mazgani "performed (or was excused from performing) all duties that she was obligated to [perform]" under the contact, and SBS "breached the Agreements of the parties by not foreclosing on the properties as it must have pursuant to the terms of the Contracts."

In August 2012, SBS filed a cross-complaint against Mazgani, "individually and as Trustee of the Mazgani Family Trust," alleging that Mazgani breached her agreements by failing to pay fees due for services rendered. The cross-complaint asserted causes of action for breach of contract and common counts, and sought damages of $2,839.40, plus prejudgment interest, costs, and attorney fees. SBS filed an amended complaint in November 2012, which was identical in all respects, but which attached the relevant contracts.

Mazgani voluntarily dismissed her claims against SBS. She then moved to reclassify SBS's cross-action as a small claims or limited civil action. SBS opposed the motion to reclassify, and the trial court denied it.

---

[9] The docket of the small claims action reflects that the motion to vacate the default judgment was granted and the case was subsequently transferred and consolidated with the action that is the subject of this appeal.

19

*B.      SBS's Motion for Summary Judgment*

SBS moved for summary judgment on its cross-complaint, urging that there were no triable issues of material fact that Mazgani had failed to pay SBS the sum of $2,754.40 owed under the contracts.  Mazgani opposed the motion.

The trial court granted the motion for summary judgment.  After noting that the opposition's myriad procedural defects were an adequate basis for granting the motion, the trial court found in the alternative that SBS's motion was well taken on the merits: "SBS has put forth prima facie evidence that Mazgani hired SBS to initiate nonjudicial foreclosure proced[ings].  SBS did so, and the plaintiff didn't pay."

**II.**

**Mazgani's Motion to Reclassify the Cross-Complaint**

**Is Not Reviewable On Appeal**

Mazgani concedes that "the sole means of challenging a ruling on a motion to reclassify is by way of a writ petition," but she nonetheless contends this court should consider the merits of her reclassification motion on appeal.  We decline to do so.  Code of Civil Procedure section 403.080 provides that if a trial court grants or denies a reclassification motion, the party aggrieved by the order may challenge it by filing a petition for writ of mandate with the Court of Appeal within 20 days after service of written notice of the order.  Such a writ petition is the party's *exclusive* appellate remedy. (*Garau v. Torrance Unified School Dist*. (2006) 137 Cal.App.4th 192, 199 [an order reclassifying a case is not an appealable order; party seeking appellate review of such an order must file a timely petition for a writ of mandate pursuant to section 403.080].) Because Mazgani did not timely file a writ petition from the order denying her motion to reclassify, the order is not now reviewable on appeal.

## III.

## The Trial Court Properly Overruled Mazgani's

## Demurrers to the Amended Cross-Complaint

Mazgani contends that the trial court erred in overruling her demurrer to SBS's first amended cross-complaint because (1) SBS failed to attach the applicable contract, and (2) SBS erroneously sued Mazgani, rather than the Mazgani Family Trust. We disagree.

Mazgani appears to contend that because SBS contracted with the Mazgani Family Trust, not with Mazgani herself, the suit against her was improper. Not so. Legal title to property owned by a trust is held by the trustee, not the trust. (*Portico Management Group, LLC v. Harrison* (2011) 202 Cal.App.4th 464, 473 (*Portico*).) Therefore, "[a] trust itself cannot sue or be sued. (*Presta v. Tepper* (2009) 179 Cal.App.4th 909, 914.) 'As a general rule, the trustee is the real party in interest with standing to sue and defend on the trust's behalf. [Citations.]' (*Estate of Bowles* (2008) 169 Cal.App.4th 684, 691.) 'A claim based on a contract entered into by a trustee in the trustee's representative capacity, . . . may be asserted against the trust *by proceeding against the trustee in the trustee's representative capacity . . .*' (Prob. Code, § 18004, italics added.)" (*Id.* at p. 473.) Accordingly, SBS properly brought the present action against Mazgani "as Trustee of the Mazgani Family Trust."

We also reject Mazgani's contention that the demurrer should have been sustained because SBS failed to attach to the cross-complaint the contracts on which it sued. This contention is not well taken: Contrary to Mazgani's contention, SBS *did* attach the two relevant contracts, each entitled "Declaration of Default -- Request to Commence Foreclosure Proceedings" to the amended cross-complaint. The trial court did not err in overruling Mazgani's demurrer on this basis.

21

# IV.

## The Trial Court Properly Granted

## SBS's Motion for Summary Judgment

A.      *SBS's Motion for Summary Judgment and Mazgani's Opposition*

In support of its motion for summary judgment, SBS submitted evidence that Mazgani hired SBS to initiate nonjudicial foreclosures on two parcels of real property. As to each property, SBS and Mazgani entered into written agreements, called "Declaration[s] of Default -- Request to Commence Foreclosure Proceedings" which stated in relevant part as follows:  "The undersigned [Mazgani] promises and agrees to pay your trustee's fee in the amount permitted by law, together with all costs and expenses incidental to these proceedings.  It is agreed and understood that you may not proceed with the sale and/[or] deliver your trustee's deed until all fees and costs have been paid.  I/we also agree to pay on demand, as well as indemnify and hold you harmless from and against all costs, damages, attorney's fees, expenses, obligations, and liabilities of any kind which you may incur or sustain by any reason of this default and foreclosure proceeding and/or the sale of the trust property by reason of any act or omission [or] commission on the part of others and the undersigned, for whom you are acting as an agent."

SBS also submitted evidence, through the declaration of SBS president and custodian of records, Mitchell Willet, that after filing a notice of default on each property, SBS obtained trustee's sale guaranties and mailed notices under Civil Code section 2924b.  SBS invoiced Mazgani for fees and costs of $1,344.76 and $1,409.64 SBS incurred to file the notices of default, obtain trustee sale guaranties, and mail required notices, but Mazgani did not pay either invoice.

In opposition to the motion for summary judgment, Mazgani admitted that she signed the "Authorizations to Proceed," but she asserted that her obligation to pay SBS was contingent on SBS either foreclosing on the properties or bringing the notes current

22

by obtaining payments from the property owners.[10] In support, she submitted her declaration, which stated that on April 5, 2010, her nephew, Kevin Moda, entered an agreement that SBS would act as trustee with regard to the non-judicial foreclosure sales. According to Mazgani:

"6. . . . The accord reached was that SBS would either (1) foreclose on the properties (and receive the fruits of the sale) or (2) have the Debtor bring the underlying notes current and therefrom collect any fees or expenses that SBS had incurred and give the remainder to Mazgani. The payment that SBS was to receive was contingent on either of the two contingencies happening as condition precedent to receiving any compensation. That is why there is no amount of monies for the 'cost of contract' referenced anywhere in what SBS characterizes as its 'contract' . . . . [¶] . . . [¶]

"16. There was no agreement that I made to pay any costs or fees to SBS regardless of the success of SBS in bringing the loan current or foreclosing on the property and receiving the fruits thereof. *Our Agreement was a contingent one*. . . . [¶] . . . [¶]

"21. I never agreed to pay any costs or fees to SBS regardless of whether or not they succeeded in foreclosing on the property . . . ." (Italics added.)

---

**10** In opposition to summary judgment, Mazgani also filed voluminous objections to SBS's declarations. The trial court declined to rule on the objections because Mazgani did not provide a proposed order. We need not address Mazgani's contention that the trial court erred in failing to rule on her evidentiary objections because she failed to show she was prejudiced in any way. " No judgment . . . shall be reversed or affected by reason of any error . . . unless it shall appear from the record that such error . . . was prejudicial, and also that by reason of such error . . . the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." (Code Civ. Proc., § 475.) Mazgani does not point to any specific item of evidence on which the trial court relied that she believes should not have been considered or how the court's ruling on any of her objections would have prevented it from granting summary judgment in favor of SBS. She therefore has not met her burden of showing prejudicial error.

23

Kevin Moda's declaration is nearly identical to Mazgani's; the only relevant difference is in paragraph six, where Moda says that on April 5, 2010, "I negotiated with SBS Trust Deed Network to have SBS act as Trustee at the non[]judicial foreclosure of the properties."

### B.    *The Trial Court Properly Granted the Motion for Summary Judgment*

The essential elements of a claim for breach of contract are the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and resulting damages.  (*Tribeca Companies, LLC v. First American Title Ins. Co.*, *supra*, 239 Cal.App.4th at p. 1109.)  To obtain summary judgment of the breach of contract claim, therefore, SBS had to demonstrate that there were no triable issues as to any element.  Once SBS did so, the burden shifted to Mazgani to demonstrate, " 'by responsive separate statement and admissible evidence, that triable issue[s] of fact exist.' " (*Cheviot Vista Homeowners Assn. v. State Farm Fire & Casualty Co*. (2006) 143 Cal.App.4th 1486, 1497.)[11]  On appeal, our review is de novo.

It is undisputed that SBS filed notices of default, obtained trustee sale guaranties, and mailed notices required by Civil Code section 2924b.[12]  It also is undisputed that SBS invoiced Mazgani for its costs associated with these activities, and that Mazgani did not pay those invoices.  The essential disagreement between the parties is whether Mazgani had a contractual obligation pay SBS for costs and fees even though SBS did not foreclose on either property.  SBS contends that Mazgani was obligated under the contract to reimburse it for costs and fees reasonably incurred regardless of the outcome

---

[11]    SBS's cross-complaint also included a second cause of action framed as a common count.  A common count "is not a specific cause of action . . . ; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness." (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 394.)  Because the common count is used as an alternative way of seeking the same recovery demanded for breach of contract, and is based on the same facts, "it must stand or fall with" the breach of contract claim.  (*Id*. at p. 395.)

[12]    Mazgani disputes the amounts of SBS's expenditures, but she does not dispute that SBS undertook the actions it describes.

of the foreclosures, while Mazgani urged that SBS's obligation to pay costs and fees was contingent on SBS's successful completion of the foreclosures.

" 'The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. [Citations]. [¶] The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. [Citations.] Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.] [¶] When the meaning of the words used in a contract is disputed, the trial court . . . provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract.' " (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc*. (2014) 229 Cal.App.4th 635, 651-652.)

SBS contends that the plain language of the contract obligated Mazgani to reimburse it for fees incurred to record notices of default, obtain trustee sale guaranties, and mail notices required by Civil Code section 2924b. We agree that the language of the contract is reasonably susceptible of this interpretation. On its face, the contract provided that Mazgani would pay SBS "*all costs and expenses incidental to*" (italics added) the nonjudicial foreclosure proceedings. The declaration of Mitchell Willet is evidence that recording notices of default, obtaining guaranties, and mailing notices were incidental to the foreclosures for which Mazgani hired SBS, and thus that SBS was entitled to be paid for these expenses.

Mazgani does not dispute that she signed the Declaration of Default - Request to Commence Foreclosure Proceedings, but she urges that the agreement with SBS was that

25

her obligation to pay SBS's costs and expenses was contingent on foreclosing on the properties (or, alternatively, on bringing the loans current). She urges: "There was no agreement that I made to pay any costs or fees to SBS regardless of the success of SBS in bringing the loan current or foreclosing on the property and receiving the fruits thereof. Our Agreement was a contingent one."

The problem with Mazgani's position is that it does not explain the contract language—it contradicts it. " ' "Under the parol evidence rule, extrinsic evidence is not admissible to contradict express terms in a written contract or to explain what the agreement was. The agreement is the writing itself. . . . Parol evidence cannot . . . be admitted to show intention independent of an unambiguous written instrument." [Fn. omitted.] Thus, as Justice Holmes explained, parol evidence is not admissible to show that when the parties 'said five hundred feet they agreed it should mean one hundred inches, or that Bunker Hill Monument should signify the Old South Church.' " (*Wagner v. Columbia Pictures Industries, Inc*. (2007) 146 Cal.App.4th 586, 592.) Accordingly, Mazgani's extrinsic evidence is not admissible to show that when the parties agreed that Mazgani would "pay . . . *all costs and expenses* incidental to these proceedings," they intended that Mazgani would pay such expenses only if SBS successfully foreclosed on the properties.

Mazgani alternatively contends that she was not obligated to pay SBS's costs and expenses because "the contract itself actually prohibits the taking of action by SBS prior to payment to it for a particular service." The contract's language does not support this interpretation. Although it says that SBS may not "*proceed with the sale* and/[or] deliver [the] trustee's deed until all fees and costs had been paid," (italics added) it nowhere suggests that SBS may not incur fees and costs before obtaining reimbursement for them. And, indeed, it obligates Mazgani to "pay on demand" all "costs" and "expenses" that SBS "may incur or sustain by reason of this default and foreclosure proceeding."

Mazgani contends finally that the contract is unenforceable because it "left payment terms and amounts to the discretion of solely one party." We do not agree. Although the contract does not specify the trustee fees, it incorporates by reference Civil

26

Code section 2924c, which describes the costs, expenses, and fees that may be charged in connection with nonjudicial foreclosures.[13]

For all of these reasons, the trial court properly granted summary judgment for SBS.

---

[13]   Section 2924c provides in relevant part:  "(c)  Costs and expenses which may be charged pursuant to Sections 2924 to 2924i, inclusive, shall be limited to the costs incurred for recording, mailing, including certified and express mail charges, publishing, and posting notices required by Sections 2924 to 2924i, inclusive, postponement pursuant to Section 2924g not to exceed fifty dollars ($50) per postponement and a fee for a trustee's sale guarantee or, in the event of judicial foreclosure, a litigation guarantee.  For purposes of this subdivision, a trustee or beneficiary may purchase a trustee's sale guarantee at a rate meeting the standards contained in Sections 12401.1 and 12401.3 of the Insurance Code.

"(d)  Trustee's or attorney's fees which may be charged pursuant to subdivision (a), or until the notice of sale is deposited in the mail to the trustor as provided in Section 2924b, if the sale is by power of sale contained in the deed of trust or mortgage, or, otherwise at any time prior to the decree of foreclosure, are hereby authorized to be in a base amount that does not exceed three hundred dollars ($300) if the unpaid principal sum secured is one hundred fifty thousand dollars ($150,000) or less, or two hundred fifty dollars ($250) if the unpaid principal sum secured exceeds one hundred fifty thousand dollars ($150,000), plus one-half of 1 percent of the unpaid principal sum secured exceeding fifty thousand dollars ($50,000) up to and including one hundred fifty thousand dollars ($150,000), plus one-quarter of 1 percent of any portion of the unpaid principal sum secured exceeding one hundred fifty thousand dollars ($150,000) up to and including five hundred thousand dollars ($500,000), plus one-eighth of 1 percent of any portion of the unpaid principal sum secured exceeding five hundred thousand dollars ($500,000).  Any charge for trustee's or attorney's fees authorized by this subdivision shall be conclusively presumed to be lawful and valid where the charge does not exceed the amounts authorized herein. For purposes of this subdivision, the unpaid principal sum secured shall be determined as of the date the notice of default is recorded."

27

## V.
## The Trial Court's Award of Attorney Fees to SBS
## Was Not an Abuse of Discretion

Following the grant of summary judgment in its favor, SBS sought and was granted attorney fees of $75,490 and costs of $2,417. Mazgani contends these awards were unreasonable and an abuse of discretion.

Civil Code section 1717, subdivision (a), provides that where attorney fees are authorized by contract, "the prevailing party . . . shall be entitled to reasonable attorney's fees" which "shall be fixed by the court." " 'The trial court has broad discretion to determine the amount of a reasonable fee, and the award of such fees is governed by equitable principles.' (*EnPalm, LCC v. Teitler* (2008) 162 Cal.App.4th 770, 774 (*EnPalm*).) In fixing a reasonable fee, the court first computes 'the lodestar figure—a calculation based on the number of hours reasonably expended multiplied by the lawyer's hourly rate.' (*Ibid*.) Second, the court may adjust the lodestar to ensure that the fee awarded is reasonable in view of various factors, including 'the nature and difficulty of the litigation, the amount of money involved, the skill required and employed to handle the case, the attention given, the success or failure, . . . "necessity for and the nature of the litigation," ' as well as other circumstances of the case. (*Ibid*.) [¶] 'We will reverse a fee award only if there has been a manifest abuse of discretion.' (*EnPalm*, *supra*, 162 Cal.App.4th at p. 774.) [The appellant] bear[s] the burden of affirmatively establishing that the trial court abused its discretion. (*Ritter & Ritter, Inc. Pension & Profit Plan v. The Churchill Condominium Assn*. (2008) 166 Cal.App.4th 103, 128.)" (*Hill v. Affirmed Housing Group* (2014) 226 Cal.App.4th 1192, 1196.)

Mazgani urges that the trial court's award of attorney fees was unreasonable because such award significantly exceeded SBS's recovery, but she cites no authority for the proposition that a fee award that exceeds a party's recovery is per se unreasonable. Further, Mazgani has not persuaded us that the trial court's award of attorney fees was an abuse of discretion. SBS provided the trial court with declarations and ample documentation setting forth its attorneys' hourly rates, the reasonableness of those rates,

28

the work performed, the time it took to complete that work, and the fees and expenses incurred. Having presided over the case, the court was familiar with the action and SBS's efforts in litigating it. " 'A [party] " 'cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the [successful opponent] in response.' " ' " (*Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 114.) The trial court had discretion to award the lodestar amount in its entirety, and Mazgani has not persuaded us that the fee award is excessive or exceeds the bounds of reason.

Finally, Mazgani contends that the attorney fee award was improper because it was not authorized by any contract. The argument, raised for the first time at oral argument, is untimely. (*Collins v. Navistar, Inc*. (2013) 214 Cal.App.4th 1486, 1508, fn. 8 [arguments may not be raised for the first time at oral argument].) In any event, the argument is without merit. The contract between Mazgani and SBS provided, in relevant part, as follows: "I/we also agree to pay on demand, as well as indemnify and hold you harmless from and against all costs, damages, *attorney's fees*, expenses, obligations and liabilities of any kind which you may incur or sustain by reason of this default and foreclosure proceeding and/or the sale of the trust property by reason of any act [or] omission or commission on the part of others and the undersigned, for whom you are acting as an agent."[14] (Italics added.) This provision facially authorized the trial court's award of attorney fees to SBS.

---

[14]    Mazgani also contended for the first time at oral argument that her nephew signed the SBS contract on her behalf, and thus it was not enforceable against her. This contention is unsupported by the appellate record.

29

## DISPOSITION

The judgments and award of attorney fees and costs are affirmed.

Mazgani's motion for summary reversal and other relief, filed July 6, 2015, is denied in its entirety. Mazgani's motion for sanctions, filed July 7, 2015, is denied in its entirety. SBS's motion to strike the declaration of Michael Shemtoub, filed July 16, 2015, is denied as moot.

Respondents are awarded their appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.